We'll hear argument in Case No. 15-1262, McCrory v. Harris. Mr. Clement. Mr. Chief Justice, and may it please the Court, this case involves the constitutionality of two congressional districts in North Carolina that should be familiar to the Court because they've been before the Court on multiple prior occasions. Even though there are two congressional districts here and they're both North Carolina congressional districts, the issues presented by the two districts are actually quite distinct. With respect to Congressional District 12, it is different from both the House of Delegate districts in the previous case and Congressional District 1, because this was not a district that was drawn with an avowed intent to create a majority-minority district to comply with the Voting Rights Act. Rather, with respect to Congressional District 12, this was avowedly a political draw. Now, if that all sounds familiar, it's because it's the exact same dynamic that was before this Court in Cromartie 2. And in Cromartie 2, this Court, in reversing a district court on the clear-error standard, concluded that when the State actually said that this was a political draw, that race did not predominate over politics in the drawing of this district. And that is essentially the exact same dynamic that is before this Court now, with one major difference. This is a much easier case for this Court to reverse than Cromartie 2 was, because even before this Court gets to the clear-error standard of a review, there is a clear legal error here that was created by my friends on the other sides and the district courts' failure to abide by the teaching of Cromartie 2. I think Cromartie 2 was about as clear as it could have been that in a case where you have a majority-minority district or something approximating it, and you have race and politics highly correlated, and you have somebody challenging the State's suggestion that this is a political and not a racial draw, what the plaintiffs must show, not can show, not may show, not it would be nice that they show, must show, is that there are alternative ways that the legislature could have accomplished its political goals without a comparable influence on race. Kagan in that passage in Cromartie 2 says, in a case like this one, and is pretty clearly following off analysis of, in a case with purely circumstantial evidence rather than direct evidence of race-based districting. I think you would have heard it, and it would have sounded different if the Court had really meant that in every case where the question was, is this politics or is this government to present maps, that passage just would have read a lot differently. I respectfully disagree, Justice Kagan, for at least two reasons. One is, there was direct evidence in Cromartie 2. And indeed, the direct evidence is eerily similar. In Cromartie 2, you had evidence that the map-drawer himself had taken race into account with the treatment of the African-American community in Greensboro, which is Guilford County. Breyer.   Breyer. Breyer. In talking about that, I guess that's why I say I was the problem. What I wrote was, in a case such as this one, and then people can argue, what does that mean? In a case such as this one. By the time we reach the Alabama case, there is a need seen by the majority of the Court to try to bring clarity. We are speaking as a court. Not every individual gets his own way or should. And so if we go back into an area and try to reconcile the cases and try to come up with, in a complicated area, a set of standards that will prevent us from being turning into the Nineteenth Court of Evidence to consider some highly detailed matters and so forth, you know, all the problems here, I would take that, or at least I'd start taking that last case, the Alabama case, as at least trying to set the way in which a district court should go about deciding a case such as this one. Should I not do that? No, in the following respect, which is, Alabama and Cromartie II are different cases. And I'll take your point that Alabama is this Court's last best guidance on how to deal with a case like Alabama and like Congressional District I where you have a State that says, why did we do it? The Voting Rights Act made us do it. We did it. We wanted to draw a majority-minority district. But Cromartie II is this Court's last and best word on cases like this where the State says, why did we do it? Politics. We didn't want to – we looked at the benchmark map. The benchmark map had Congressional District I over here, which was a majority-minority district or at least close, and we wanted to preserve that as a majority-minority district. We know how to tell you when we're taking race into account. We said we're doing it. We're not playing hide-the-ball here. We did it with respect to CD I, and when it comes to CD XII, we look at the benchmark  That's a political draw. We're going to be – Kagan. Well, the question is, is it, right? I mean, that's the question that the district court was trying to answer. Is it politics or is it race? If it's politics, it's fine. If it's race, it's not. And so let's just take a hypothetical, not this case, but let's take a hypothetical which is a state really does decide to do race-based districting, says we want to segregate all the African-American voters. This is the way we want to do it. But then they say, well, we'll justify it based on politics, because that sounds better, right? So – but there's lots of direct evidence that, in fact, the justification is politics, but the true reason is race. Now, were you suggesting when you stood – when – in your first statements there, were you suggesting that even if a plaintiff comes in and has all this direct evidence that they're really trying to do race, that the plaintiff has to present its own maps? And I would say yes. And I would say, why not? I mean, we're talking about a situation where the plaintiff's going and asking a Federal court – in this case, after they've already asked a State court and lost. I'll get into that later, maybe. But we're asking a Federal court to say and hold that a sovereign State legislature that says it's politics was dissembling and it's actually race. Now, that's a big thing to ask of a Federal court. It's a unique thing in these Cromartie 2 cases, which is different from what you're asking a Federal court to do when the State is forthright that we took race into account to comply with the Voting Rights Act. But – Kagan Well, it's also a big thing to ask plaintiffs to come in with their own maps if they have direct evidence that the State is doing race-based rather than politics-based districting. Clement Well, I guess I'm a little less troubled by being demanding of plaintiffs than I am of putting sovereign State legislatures in a difficult position. And if there's all that direct evidence, gosh, I think the alternative map drawing is going to be a breeze. I mean, if, you know, if there's really all this direct evidence that this was really about race and the idea that this was about politics is just a pretext, I think it's going to be easy as pie to show, well, actually, right here, you could have drawn this map differently, and you would not have taken race into account. Kagan Not so easy, because we know that race and politics correlate. And the question is not – I mean, that's just a fact of the matter. But we've said notwithstanding that, if race is your motive, you get one result, and if politics is your motive, you get another result. So these maps are actually hard to do, given the extent of correlation there is. But direct evidence of race-based, which I have to say there really is some in this case, because the principal line drawer says they told me to get above 50 percent BVAP, direct evidence, you know, that basically makes the case for somebody. Well, Your Honor, just to be clear, that – that – the direct evidence of the map drawer actually is incredibly helpful for my clients as to CD12, because the same guy who had no problem saying as to CD1, it's above 50.1 percent, also testified that he had exactly the opposite instructions for drawing CD12, and that when he drew the map, he didn't even look at racial data. He looked at the 2008 presidential election and the political results from that and drew the map in order to bring in Democratic voters and exclude Republican voters. So – and that's – I'm sorry? Didn't he say that he was told specifically to not consider race except with respect to Guilford County, which is probably the most important piece of this discussion? No, that's not what he said. He didn't say – he basically said, look, do it as a political draw, and then you're going to have to essentially check what you did in Guilford County with the African-American community, because Guilford County is a covered jurisdiction. Sotomayor, we can go back to the original deposition testimony, which is what the district court, I think, what the court below relied on. Absolutely. But you look at that deposition testimony and you look at his testimony at trial, and it all fits together, because he – and again, he never says, oh, well, actually, when it came to Guilford County, I turned off the political screen on my map-drawing software and picked up the race-drawing screen. What he did is the whole time he drew the maps, he had political data up there. Precisely because race and politics are highly correlated, he drew the map to draw the Democrats in and the Republicans out. Then he checked his work specifically with respect to Guilford County, and he did treat Guilford County differently, and he should have, because Guilford County is the only covered jurisdiction in CD12. And he looked and he said, all right, I got the African-American community together. I don't have a problem. Now, my friends on the other side want to take whatever quibble there is about Guilford County, it's essentially uncontroverted here, that with respect to every other part of the map, race wasn't taken into account at all. It's essentially uncontroverted, because nobody says he turned the political stuff off for Guilford County. So all he did is he did a cross-check as to Guilford County to make sure that there wasn't a retrogression problem with Guilford County, which is exactly what he should do, by the way. But talk about eerie similarities. I mean, it was Guilford County and it was Greensboro and Cromartie too, and what this Court said in giving that direct evidence, relatively minimal weight, was to say, well, you know, if you look at the rest of that e-mail, the map drawer was very candid about taking race into account in drawing CD1, and was much, there's much less race involved in CD12, so it didn't predominate. Again, the similarities could not be more dead on with this case. So the most you can get out of Guilford County is that race was taken into account in some way that did not make it predominate, and the same evidence here, as in Cromartie too, that if you contrast the way the legislature proceeded with respect to CD1 and CD12, it's virtually impossible to think that this was all a pretext. I mean, you know, I understand why you want to search a little bit more when you have a legislature who comes up with these racial maps and they say as to all of it, race had nothing to do with it. But when the legislature repeatedly says we treated CD12 differently from CD1, I would think that you would want some pretty substantial evidence before you second-guess that conclusion and overrode it, and I would think that you would want the maps. You would want the maps. And if I could just say this. Kagan.          Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. But my boss has told me I have to get up over 50.1 percent black votes. So that seems like substantial evidence, a congressman says, reports on a direct conversation he's had with the map, who says he has received orders from on high. And, well, no, see, that's the thing. I mean, there's a dispute whether that conversation ever took place. In the record in this case, you have Senator Rucho who protests that that's not what happened. You also have another witness. That's all in the record here. Ginsburg. But wasn't there a credibility finding? Didn't the district judge say, the three judges to court say they credited Watt and not Rucho? They did say that, but that only gets you to the point that, okay, I mean, maybe even if Rucho said that, it didn't get translated to the map drawer. Rucho and Lewis make multiple public statements that say that CD12 is not a racial draw. It's a political draw. You look at all the other evidence here. And let me get back to the maps, because here's the thing. I mean, you didn't just make that stray comment in Cromartie 2. You did it after your analysis in the opinion where you looked at the maps, because it wasn't like the problem in Cromartie 2 is they didn't have alternative maps. The problem was in Cromartie 2 is they had the alternative maps, and they showed that they're very, very useful just because race and politics are so highly correlated. So when you try to draw an alternative map, as in Cromartie 2, and it's like, oh, guess what? You can get a better racial balance only if you pair two incumbents? Nice job. Breyer. I understand the problem of Cromartie 2. I understand it, believe me. And I think that the problem in Cromartie 2 is it doesn't say in all cases. I mean, it's pretty care — I write that for a purpose. You know, the Court writes when it says in a case like this one. It's a little ambiguous, but it means it. By the time — as time progresses, as time progresses, we face what you see and I see as the problem right now, which is a set of standards that district courts can apply which will try to separate sheep from goats. Without us spending the entire term reviewing 5,000-page records. All right. That is a problem that you have by the time we — pretty clear by the time we get to the later cases. So I don't know. I understand your argument. I understand your argument. I'll go back and look at it. You think it's absolutely determinative, the Cromartie 2. I'm not so sure. I think it's determinative, because you didn't just say in a case such as this one. You said in a case such as this one where it's a majority-minority district or a close approximation and race and politics are closely correlated. And I'll even give you a third criteria, which is in the cases where the legislature's stated goal was politics, not race. And so it's — you absolutely said it, but you were also absolutely right. And before you decide whether it's sheep or goats, I think it's perfectly fair to say that there are two breeds here generally. There are the cases where — and they're the more common ones, the Alabama cases, the Shaw cases. Those are all cases where the State comes in and CD1, which I'll talk about in a minute, those are all cases where the State comes in and says, yep, it was race. It was race because of the Voting Rights Act. We don't think race predominated, and if it did, we survived strict scrutiny. But there's a whole separate class of cases, the smaller cases, where the State comes in and says it wasn't race at all. It was politics. And sure, they're highly correlated, but it was politics. And they're very sensitive cases for the State, because if the State does that, as this case shows, if they're — if they lose because they're found to have dissembled, they don't even get to the second half of the case, because I can't come up here and argue that it was politics, not race. But if you think we're lying, by the way, it was — we narrowly tailored. I mean, you don't have that opportunity. And so there has to be a very high threshold. And Cromartie too addresses those cases like a laser beam. If you want to give guidance to the lower courts, don't tell them you faked them out in Cromartie too. I mean, say that you are going to stick with that and identify this class of cases and say that's the test for those kind of cases. And it's not the world's, you know, biggest burden to come up with an alternative map. And if the alternative map shows that the way that you take race into — rather, politics into account to the same extent without — with better race is by pairing incumbents or making a district that looks like this look like this, which is exactly what you found in Cromartie too. You looked at those alternative maps, and they weren't, you know — I mean, you know, it was not beyond the kin of man to come up with alternative maps in that case. The problem with the alternative maps in that case is that they actually showed that the legislature was exactly right. Breyer. Breyer. Let me just say, even though the district court listened to the map drawer and believed him, and his statements are pretty much against you, and then they heard two of the State senators, and they were pretty much against you, and it's up to the district court to evaluate the strength of witnesses, and came to the conclusion on the basis of that, that in fact it was — race was really the explanation. Despite that, everyone who comes in has to have an alternative map. And of course, if we have five intervenors and so forth, we're going to have five or six different alternative maps drawing 400 — I don't know, 100 State legislatures and so forth. That's what I'm supposed to say. Well, first of all, I don't think that the direct evidence here is of a character that is materially different from Incremarty 2 itself. And I would say that, look, you're trying to give district courts directions for a whole bunch of cases. Everybody is going to be able to say, I have direct evidence. There's always going to be some direct evidence. The quality and character of it is going to differ from case to case. But what I think you should do is, in this class of cases where the State's defense is politics, not race, is all five intervenors can get together, pool the costs, which are going to be minimal, give me at least one alternative map that shows that you can do the same political thing without a comparable effect on race. I don't think that's too much to ask. I think it would make your jurisprudence much more administrable. It would also have the virtue of applying stare decisis, because you did say it in Incremarty 2. And, again, you know, every one of this Court's cases says that this is an extremely difficult business, that it's an inherently legislative business, that it is a humbling and big thing to have a court second-guess these decisions. So I think in a world like that, especially when you've already said it, to say that there is an alternative map requirement as a gatekeeping function to guide a district court, to give the district court the same tools you used in Incremarty 2 to say, ah, you know, it's easy to say that that was a pretext. But when I actually look at this, you know, and I'm going to at the end of the day, I mean, I'm going to look at that alternative map in conjunction with the direct evidence, the circumstantial evidence, but I'm at least going to be guided by something that says, you know, there was another way to do this. And that really does make me think that this direct evidence is a lot more probative than it might otherwise, because I see there was an easy alternative. If they really just wanted to help the Democrats hurt the Republicans or vice versa, they could have done it with a completely different racial balance. Sotomayor, what do we do with our statement in Miller that what the evil we're trying to address is the use of race? And once it's met, you don't need a manifestation of it, you need just the use of race. Does it predominate? That's the evil the Constitution is intended to avoid. See, our way is to say State legislatures, go out and always say it's politics, because it's real easy to say politics, even though there's a lot of direct evidence that it really was race, and put the added burden on a plaintiff now to do a map where you'll come up and say on their map, ah, this takes care of this problem, but there's another political reason for not doing it that way. There's another political reason for not doing it this way. It's impossible to ask a plaintiff to come up with a race-neutral map in light of the entire region. The issue is, are State legislators prohibited from using race predominantly? And if they are, and the proof is they have, then they should go back to the drawing board and do it without it. Well, Your Honor, I think that, sure, at the end of the day, in these districts where you basically have one party saying it was politics and the other party is saying it's race, you do ultimately have to have a mechanism for determining which one it was. And our humble point is, everybody agrees that they're highly correlated. That certainly creates the possibility for abuse. So we're not saying there shouldn't be any test. What we're saying is that, you know, this is a difficult thing. It is a particularly damning thing to say that a State legislature, especially when they're being candid about their use of race in CD1, to say that they were dissembling is a pretty big thing. And it's going to be the only issue in the case, because there isn't going to be any strict scrutiny to fix it on the back end, because they're going to say we didn't take race into account at all. To simply say, it is certainly not beyond the kin of man or woman or anyone else to come up with an alternative map, and it's not just you're doing it to be mean or imposing costs. They're actually exceedingly useful for the analysis, and you only have to look at the Cromartie 2 opinion to show how they can really show, well, yeah, if you do that, you're going to elongate it. And that's not going to be the case in every case. In some cases, you are going to be able to come up with a perfectly functional alternative map. If I could turn my attention now to CD1, which is an issue – which is a case that is more like the Virginia districts in the sense that here it is. It is a valid use of race in order to preserve a majority-minority district. Now, as to this one in particular, we think that the district court erred in applying strict scrutiny simply based on essentially the adoption of a BVAP floor of 50.1 percent. But the easiest way to affirm is probably to do what the North Carolina Supreme Court did in the parallel State litigation, which it also confronted a district court that applied strict scrutiny because a BVAP floor was applied. But the lower court there had said, but applying strict scrutiny, we think this is narrowly tailored. The North Carolina Supreme Court said, you know, the district court screwed up on finding strict scrutiny triggered, but nonetheless, we agree this is narrowly tailored. And I think you could do the same thing here. Obviously, you would be reversing the district court on the legal judgment about narrow tailoring, but it may be the easiest way to decide CD1. Because here, the map drawers, of course, they admitted they took race into account, but they were dealing with a difficult problem, which is they had a benchmark map that had CD1 as a majority-minority district. Now, it was – to be sure, it was a coalition district. It was at about 48 – a little bit north of 48 percent BVAP. But it had also lost 97,000 votes. And so they want to preserve it as a majority-minority district. Based on their reading of Strickland and some other things, they say, you know, the safest way for us to do this is to get it over 50.01 percent. So we're going to tell the map drawer that we want this over 50.01 percent. The map drawer gets that instruction and draws a district that ends up at about 52.6 percent. Now, the very fact that it's at 52 and not 50.1 shows that it's not like this ratio was preserved over everything else. But also, I think it's worth, in this case in particular, to understand it's not like there was a myriad ways to do what the map drawer did in this situation. There were really two opportunities. You could either draw the district to get part of Wake County, and that would get you over 50 percent, or you could go into the city of Durham and get over 50 percent that way. The first time the map drawer drew the map, it drew in Wake County. It got to 50 percent that way. There was some back and forth with Representative Butterfield and the like, and they decided, you know, okay, we'll do the Durham County. Kennedy, to what extent and in what circumstances does Section 5 of the Voting Recreation Act require that a contiguous district be drawn in order to comply with strict scrutiny? Assume that you're using race, and then you have to comply with strict scrutiny. To what extent do you think the VRA requires a compact or contiguous district? I think it requires a reasonably contiguous district, and I think, I mean, this is a situation where, you know, this was you had a more compact district, and in order to get either Wake County or Durham, you essentially have to extend the district to capture those territories. The one thing I'd say before I sit down, additional thing I'd say before I sit down about CD1 is I think it is very telling to look at Representative Butterfield's testimony in the record here, because what the lower court found is that the reason that we lost on strict scrutiny was there was not racially polarized voting in CD1, or more particularly, the State hadn't done enough to show that. Now, nobody thinks that there isn't racially polarized voting in CD1. They don't think that. They think we didn't do enough to prove it, but they don't think that. Representative Butterfield doesn't think that, and he was the incumbent in that district. The dispute is not over whether there's racially polarized voting. It's whether, well, you know, as Representative Butterfield testified, it's got to be at least 45 percent. Forty-six or forty-seven is probably better. It couldn't go south of 45 percent. Representative Butterfield says that fully two-thirds of white voters will never vote for an African-American candidate in CD1, so he admits there's racially polarizing voting. So all this case comes down to, it's not about whether we like racial targets or we don't like racial targets. It's whether you're going to give the legislature the flexibility to choose between 47 or 48 on the one hand or 50.1 or 52 on the other. And if deference to legislature means anything, that has to be within the deference the zone of deference. Thank you, Your Honor. Roberts. Thank you, counsel. Mr. Elias, welcome back. Elias. I feel like I never left. Mr. Chief Justice, and may it please the Court, I'd like to actually jump in and just go through District 12 as my colleague did and then talk about CD1. The problem that the State has in CD12 is that the finding of predominance was more than amply supported by the record that the trial court found, and we are under a clear error standard. The question, as Justice Breyer, you pointed out, is whether race was a dominant and controlling factor in moving a significant number of voters in or out. And it seems that the primary defense that the State has in trying to overturn the decision of the lower court is that an alternative map was not introduced. While certainly an alternative map is a way to adduce evidence, it can't be an alternative way. That it is the only way to adduce evidence. There are all manner of ways to prove that race predominated. I would point out that we offered no alternative map in the last case. I would point out that we offered no alternative map in Persona Hubbella, which was the case that you heard earlier this year. Well, why not? Because in each of these cases, and in Alabama, they offered no alternative map. In each of these cases, there was no need to provide an alternative map to prove it circumstantially what amply existed directly. It is not true that the State of Alabama in that case, or the State of Virginia in this case, did not assert political motives as a defense of some of the districts. I actually last night. Breyer, in respect to this district, District 12, because when I go back to Cromarty 2, I think he's right. It does say that at least where the evidence is close, where it's a close question, where one side is saying it's racial, the other side is saying it's political, then it says the party attacking the legislature's boundaries has to show that the legislature could have achieved its legitimate political objectives in alternative ways that are equally consistent with traditional principles. Now, it does say that. It does, Your Honor. Breyer, so what is it that you suggest, my having been quite strong for following the sorry decisis in this, what do you suggest about that? Are you going to say this isn't a close case? Are you going to say we should overrule that? What is it you want to say? I would say two things, Justice Breyer. The first is I'm taking issue with the suggest that trial courts are confused and that this is a reversal on trial of the trial courts. The trial court in North Carolina was not confused that a map was not required. The trial court in Virginia was not confused. Breyer, explain why isn't, not a map, but some kind of evidence that they could have achieved their political objectives with less reliance on race. That's what it seems to say. I think, Your Honor. You could say it doesn't really say that. You could say, I mean, there are many things you might say. I'm not suggesting an answer. I want to know what you do say. Here, you could say it doesn't matter because we have a giving weight to the district court, doesn't matter, isn't that important. But I don't want to suggest something. I'm not. I want to hear what you think. That's my suggestions I see. Your Honor, I think that Cromartie, the language in Cromartie that is being focused on is discussing the case, that case, the case in which, as you say, there were lots of maps. That was a fundamentally a maps case, where each side is proving their case through maps, principally through circumstantial evidence of what was in various versions of maps. In that case, where you're offering a lot of maps on both sides, you at least have to offer one that shows you achieved the goals, the political goals, without, without race predominating. I would point out as an important footnote, the State, on remand, the State of North Carolina actually did draw a remedial map in this case. So it's not a hypothetical whether they could draw a map that achieved their political goals, that did not gerrymander based on race, because, in fact, the State of North Carolina after this drew a map of validly unpolitical data, not using race data, and, in fact, drew this district at a lower BVAP, and yet protected the Republican nature of the district. Alito, did they say that that map served political ends to the same degree as the map that's before us? I don't know what it means. Your Honor, if it, if they didn't say that, then, the fact that they were able to draw another map doesn't, doesn't really prove anything. If a legislature says this was done on, based on politics, and there's no way we could have achieved our political objective without doing this, they can't prove a negative. So it makes sense to turn to the other side and say, prove that that's wrong. Prove that the political ends could be served without taking, without drawing the map that was, that was before, that was drawn. Your Honor, I think the problem with the reading, that reading, and the reading that's being offered is it puts the constitutional cart before the horse. The, the harm is in using race as the predominant factor. There is no constitutional right to political gerrymandering that has to be protected. What has to be protected is voters' rights. Alito, but the question is what was the basis for it? Was it politics, as they say, or was it race? Precisely. So if there isn't, if no one can point to a way of achieving the political objective other than through the map that was drawn, then that's evidence that politics was the reason for it. It, Your Honor, it may be evidence of it. It may also be evidence of race serving as a proxy for partisanship, which is not permissible. But even if it's not that, Your Honor, it may be evidence, but that doesn't mean there can't be other evidence on the other side. Okay. Well, would you, would you accept that a map is necessary, except in the case where there is quite strong evidence that race was the basis? I don't think that this Court needs to define out the strength of the evidence. I think it's evidence. I think a map is evidence. I think direct testimony is evidence. I think, like most trials, it's a mosaic. It's not a, it's not a smoking gun. It's a mosaic of evidence. And the mosaic of evidence in this case. Well, how much weight do you think the absence of a map is entitled to? I think the absence of a map is entitled to no weight. I think that the fact that there is a, that there is a map that, that is, was enacted is obviously, is obviously, and the evidence that they adduce at trial, that race and party correlate to a large degree is obviously evidence that it was, that it was political. But in this case, look at what it is that Rucho and Lewis said. Before we get to Hofler, the map drawer, let's talk about what they said, what the sponsors said. Quote, because of the presence of Guilford County, this is not descriptive. This is because, but for, because of the presence of Guilford County in the 12th District, we have drawn our proposed 12th District at a black voting age level that is above the percentage of black voting age population found in the current 12th District. That is a statement from the sponsors that it was race. What did, what did the experts say? The experts said in his expert report, and this is JA 1103, the General Assembly, mindful that Guilford County was covered by Section 5 of the Voting Rights Act, determined that it was prudent to reunify the African-American community in Guilford County. This could avoid the possibility of a charge of fracturing that community, fracturing that community, and inhibiting preclearance by the Department of Justice under Section 5. This extension of new 12th District further to the northeast into Guilford County caused, caused the circumscribed circle around the district to increase in diameter and lower the REOC score. Well, I think the, the evidence with respect to Guilford County is your strongest evidence, but beyond that, the rest of it is not very strong. Your Honor, but that is where the, where race predominated. Race predominated in a district, Justice Breyer, to a question you asked in the last, in the last case. This was a district that was overpopulated by 2,800 people, 2,800 people. This was, this was almost spot on, one person, one vote. And yet they moved 75,000 African-Americans into the district. So to say, well, Guilford County is not my strongest case, yes, that is in fact where they moved. So the State ever put on any evidence that that was necessary to avoid a retrogression problem under Section 5? No, no. They offered no evidence that it was to comply with the Voting Rights Act at all. And why is that? I mean, it seems like as though that's what they would say. Why, why wasn't that at issue? Whether it was a strategic litigation decision made by the trial lawyers, that they wanted to put all of their eggs in the, so to speak, in the politics-not-race basket, or whether their expert wouldn't support that this was actually necessary to comply with the Voting Rights Act, I don't know. But they, but that was not their argument. It's also important, Your Honor, though, to realize that the evidence doesn't stop there. You have Mel Watt, who at this, who by the time he testifies before the district court, he's out of Congress. He has no stake in this district one way or the other for himself. Okay? He has moved on to the administration and, and, and a life after electoral politics, and he says he's told that the reason why this happened was that, that it had to ramp up to over 50 percent to comply with the Voting Rights Act. Breyer, I think they, they did make the case. They said, yeah, we did that, and the reason we did it is most of the African-American voters vote for Democrats. And we want to get all the Democratic voters in one district so that there are 15 that are Republican. But just what the Democrats did last time. I mean, that's the kind of argument that they make. What about that? What Mel Watt was told is that he, as a respected African-American, was going to be expected to sell to the African-American community. That's what he said. He was going to be expected to sell to the African-American community that this needed to be over 50 percent to comply with the VRA. And you know what Mel Watt said in his testimony? You should read it. He laughed. And he said it's not possible because the people in this district will know that there isn't a reason why this has to go above 50 percent to comply with the Voting Rights Act. The trial court also discounted the testimony that you, that, that my, my good friend and colleague has, has suggested was offered by the map drawer, Mr. Hoffler, about what he was told and that he only used, that he turned off race and he only used partisanship, that whole, that whole analysis. The district court didn't credit. Didn't credit. Said that I, I heard the testimony, I did what a trier fact did, I listened to the live witnesses, and I didn't credit it. It wasn't believable. Alito, can I go back to, to Congressman Watt's testimony? Now, you refer to something other than what I thought you highlighted in your brief. What you highlight in your brief is double hearsay. Congressman Watt said Rucho told him that somebody else told him something, and none of those people is actually the person who drew the map. Now, I don't even know whether any of that's admissible to prove the truth of the matter. But if it is, it's pretty weak evidence. Well, Your Honor, it was admitted, there was no objection to the evidence, and it is evidence that the trial court, in viewing the witnesses and weighing all of the evidence in front of it, credited it as important evidence. So I understand, obviously, the Supreme Court, you can do whatever you want, but I think that the role of an appellate court is to look at the trier's effect and say, look, you weighed the credibility of this. And whether it sounded like attenuated double hearsay or whether it sounded, and against all of the rest of the evidence, it sounded like something that is believable when judging demeanor and the like. The other thing that I think is here that is overlooked is, look at what the actual number came in at, right? Isn't it coincident that politics drove the map, and yet it wound up with a BVAP of 50.66? Isn't that coincident? Shocking that they turned off political, they turned off racial data, and they drew a map, and it just so happened that it came in at 50.66. That's not a coincidence, and the trial court was entitled to not find it to be a coincidence. That the fact that the number that ultimately came in was just a hair above, above the threshold for a Section 2 VRA district is not coincidence. It's further evidence that race, that race predominated. Ginsburg. Mr. Lass, I'd like to ask you about the procedural issue in this case. Yes, Your Honor. It was another case, it was in the State court, the same issues, just decided the opposite way. We're hearing this case, and you are urging that the plain error, clear error, is the legal standard by which we should judge what the three-judge court did. But if we had the State case before us, I suppose their findings would also be judged by the clear error standard. It's just, isn't that so, that if the State case went the other way, came to us, we would look at that and say, no clear error? Your Honor, I think I have two responses to that. The first is the court applies clear error to the case before it, where there's a finding effect by the trier effect. And that's the rules of appellate procedure. That's what this Court has done for many, many years, and it is what my clients are entitled to. This is their case. They brought this case. They're entitled to have it adjudicated under the normal rules, the well-established principles of this Court. Kennedy, but Justice Ginsburg can pursue and protect her own question. What she's saying is a matter of just luck of the draw, and it's true that the State case was first. Well, so the second point I would make, I said there were two points. The second point I would make, Justice Kennedy, is that the State case was really quite a different case in several respects. First of all, the State case was predominantly, to use a word that's come up a lot, was predominantly about the State lines. Yes, they were challenging the congressional districts, but most of the testimony in that case actually didn't relate to these two congressional districts. It actually related to the State districts, number one. Number two is there are not the findings of fact in the Dixon case, the case, the State case. There are not the specific findings of fact about the credibility of witnesses that are found in this opinion. So this trial court was very meticulous in laying out what facts they found most credible, what they were relying upon. The State court action was much more conclusory in that regard, in part because, frankly, it was dealing with a mountain of evidence around the State legislative in the State Senate, the State Senate districts. And then finally, I would say, Your Honor, there are other judicial mechanisms available to this Court and to district courts generally to control, to handle the question of multiple cases moving through the system. Congress made a decision that in the cases of Statewide redistricting, there would be an expedited process for cases to move up through the Federal system to the Supreme Court. Whether that was good policy on the part of Congress or bad policy on the part of Congress, it was a policy decision on the part of Congress, that those, that cases that come up out of the Federal courts come from a three-judge panel on direct appeal to this Court. And the other, the other case, the other case goes through the normal cert channel. And this Court might choose to hear it, it might not choose to hear it, but that's not an accident. That's not fortune. That is actually a deliberate decision that Congress made in structuring, structuring the review. And then finally, I'd say is that this is a question of the application of Federal law and the Federal Constitution. Our, our claims are, in fact, Federal constitutional claims. The defenses are largely under the Voting Rights Act. And it, there is no reason why this Court wouldn't give the same normal weight to a Federal three-judge panel in the finding of facts in those kinds of case, cases and somehow defer to, defer to it.  It's not a question of deferring. It's a recognition that the State courts have an obligation to construe the Federal Constitution to the same extent the Federal courts do. I would have thought that was a pretty well-established principle. They do, Mr. Chief Justice, but it is also an equally well-established principle that this Court judges findings of fact by lower courts under clear error. Whatever the State of North Carolina. Well, that doesn't seem responsive to the point you just made, which I understood to be that we ought to give greater deference to the Federal court's findings and rulings than we would with respect to a decision from a State court. Then I misspoke, Your Honor. I'm not saying we should give greater deference. I'm saying we should follow the rules. We should follow the ordinary rules, the ordinary courts, which is the case that is before you is the, is the case before you. And the finding of fact by the trial court in this case are the finding of fact that are entitled to clear error. What I was, what I think I was trying to address is there are circumstances, for example, in the, in the Gros situation, where you have a deadlock, where there is no map before a State court. I'm sorry, there's no map, because the map has either been deadlocked or it's been thrown out. There, the court has said, well, let's let the State courts go first, because they're exercising a policy judgment of the State. That's not present here. Here, it's the Federal Constitution, and it's the Federal, Federal Voting Rights Act, so there really is no unique State perspective that ought to cause you to overturn a 100-plus, 200-plus years of jurisprudence about plaintiffs having a right to have their case heard. Alitoso, do you think we should give any consideration to the State court decision, or should we proceed as if it never occurred? I think you can read that decision in the way in which you would read any other decision of a lower court that may be of interest to the court, so I don't think it is entitled to any more or less deference than a, you know, than a decision of the North Carolina Supreme Court that it may have had in a, in a racial gerrymandering case from 1998. You know, it's, it's, it certainly can, can inform you, but it is, can inform your thinking of the, of the case, but I don't think the findings of fact are entitled to any weight in this case. I think that clear error standard applies. With respect to congressional district 1, I just, because my time is about to expire, want to make the point that this was just a clear error of law. The court found, the court relied on an incorrect reading of Bartlett. That led it to believe that it needed to destroy a crossover district, which is, which is what it did, where there was no evidence of racially polarized voting actually preventing African-Americans from electing a candidate of their choice. I appreciate your indulgence. Thank you. Thank you, counsel. Ms. Zaharsky. Mr. Chief Justice, and may it please the court. I'd like to start with congressional district 12. This is the serpentine district, the one that basically everyone agrees looks terrible, and the question is whether race was the predominant motive or whether it was politics. Now this determination, the court has said on numerous occasions, is one that's reviewed for clear error. And the district court had a lot of evidence before it. It went through a three day trial. And I just want to highlight some of the key evidence that it relied upon in making credibility determinations. And in finding that race was the predominant motive. And that starts with Congressman Watt's testimony that Rucho, who is one of the architects of the plan, told him that they had to ramp up the minority voting percentage in the district to over 50%. So that's the racial target at the starting point in order to comply with the Voting Rights Act. And then, as counsel mentioned, we have that target being hit on the nose, 50.66%. And then we have evidence, direct evidence, of the way that the state did it. And that came from the map maker. And he said, although he did also say first that he only used politics, did not use race. He made contradictory statements and said that he did use race with respect to Guilford County. That he pulled the black population from Guilford County in order to comply with the Voting Rights Act. And I think if you looked at the record, Justice Breyer, you would see exactly what you anticipated, which is that the state was pulling in concentrations of the black voting age population. And the concentrations were so high that that supported this inference that they really were using race. And there's a chart in the plaintiff's briefs and there's evidence cited in our brief that shows that you really had that concentrated pulling in. That's how it was done with respect to Guilford County. And then the last thing, and I think that this is important, is that the district court made credibility findings that the political motive had been discredited. Mr. Clement is right. There is evidence that was there about political motive, but the district court found that it just wasn't credible in light of Congressman Watt's testimony, which the court credited about the target. And in light of the fact that the political testimony, which was mostly put on by the mapmaker, had been contradicted by the mapmaker himself when he said that he used race. And also contradicted by the two architects of the plan who kept trying to downplay politics in their statements. And so when we look at this, and particularly in light of the clear air standard, you have a three-judge panel that went through three days' worth of evidence, made credibility findings, went through volumes of evidence. And even the one judge that disagreed with respect to this particular holding recognized that what the majority did was reasonable. Referred to it as eminently reasonable, the well-reasoned opinion of the majority. And in those cases, I just don't think that you can find clear air. What's your view- Roberts. What do you have to say about the voting rights? I mean, the clear air standard with respect to the State court decision as well. I mean, it is certainly something of a fortuity that we have the Federal case before us and not the State case. And if it were the State case, we'd be reviewing their factual findings on the same question for clear air, and now you're saying, well, this one's here, so we should apply clear air. It seems to me that that response is not terribly helpful in addressing the conflict that's before us. Well, a couple of responses.  I mean, I don't think that you can find a clear air standard with respect to the State court decision as well. I mean, it is certainly something of a fortuity that we have the Federal case before us and not the State case.  question for clear air, and now you're saying, well, this one's here, so we should apply clear air. It seems to me that that response is not terribly helpful in addressing the conflict that's before us. No, I'm not saying that. Well, I didn't understand. State court was decided first, and then you say we should apply res judicata. So what does that mean? Well, the application of res judicata would depend on North Carolina law in this instance, because it was a case out of the North Carolina courts, and we don't have a position on the application of North Carolina law. I'm just saying that the way that you deal with this question is through application of the res judicata framework, as opposed to doing something different, like saying, now we won't use clear air anymore, we'll go to de novo review or something like that. So you want us to apply res judicata to decide this question, and you don't have a position on what the answer is? Well, I think if the Court is worried about the State court having some effect, that it would ask whether there was a res judicata bar, and there would be three hurdles I think that the State would have to overcome in order to prove or in order to show that there was a res judicata bar. First of all, whether the argument was waived, that's addressed in the briefs. Second of all, whether the factual predicate for privity that the State claims is there, there's also a substantial question on that. And then third, whether North Carolina law uses a concept of privity that is very expansive, really beyond where this Court was in the Taylor v. Sturgill decision. My point is not that you need to resolve that or that you need to decide it a certain way. It's just that if you're asking about how do I do with the State court decision, the way that you figure out what to do is by using those principles. What you don't do is simply defer to the State court findings. I don't see how you would do that, because this case is here on appellate jurisdiction. You need to decide the case that's before you. And we don't think you would do something like use de novo review, because after all, Rule 52, which mandates clear air of factual findings, applies to this Court. So I think this Court should decide this case as it comes to it, and with that is with the clear air standard with respect to District 12. What is your view of the Just on District 12, you say there was a racial predominance. Strict scrutiny fails because Because the State didn't give any reason to pass strict scrutiny. The only potential reason would be Section 5 that the State had, I think, suggested, and that that wouldn't make sense, because Section 5 is to prevent retrogression, and here they increased the black voting age population by 7 percent, so it wasn't a matter of preventing retrogression. What is your view of when maps should be required? So we don't read the Court's decision in Cro-Marty 2 to require a map any time a political motive is asserted. We take the Court at its word in a case like this one, and that was a case of circumstantial evidence of race. There really was very little direct evidence of race. The Court even put direct in quotes, because it thought the direct evidence was so insubstantial. But there was strong evidence of politics and a correlation between race and politics. So when you have the strong evidence of politics, little evidence of race and the correlation, then we think it made sense in the context of that particular case for the Court to say, particularly since the maps were put in, like give us an alternative that really shows this. But when you have a case, conversely, which is a strong, direct evidence of a racially predominant motive, it just doesn't make sense to require the map. Because what the Equal Protection Clause gives you is not having race being used for an unjustified reason. It's not the map isn't a per se. It's just the map is just an evidentiary thing that you could have or not have. It's one type of evidence. If there's not strong, direct evidence, would a map be necessary? Well, we think that this Court has tried to give flexibility in terms of proving racial predominance. So we see Cromartie as a strong, direct evidence of politics case. And maybe one other thing that I might say is that we just don't think that the Court, we think the Court, if it were adopting a map requirement for some clear set of cases, that it would have explained it in its opinion. And it would have done something with its prior cases. But what's I think going on in part is a very tough matter. And years ago, back years ago, there were many States that had many black citizens and no black representation. And there was a thing called let's have majority minority districts. And the problem is how does the law permit the creation of that and at the same time prevent the kind of packing that might appear in other cases, which is gerrymandering? And no one, I think, has a good answer to that question. They're just slightly better, slightly worse. So if you're too tough in this case in rejecting the notion that it was politics, which is correlated with race, then what's going to happen out there to a successful effort to create majority minority districts where matters change, times change, oceans rise, you know, et cetera, and how do we keep how do you see the problem? Yes. I mean, we're very sympathetic to the State's interest. And we think that the Court has tried to be sympathetic to the State's interest. And we think the Court has done it in decisions like Alabama. And there's two things in particular that the Court has done. It's not just the State's interest. It's the Constitutional interest in seeing that minorities have representation in reality in the legislatures. Right. And so what this Court has done, first of all, is to ask about racial predominance. The first question being, was race really the predominant motive? Not just one factor, but the predominant motive. Show us your evidence. And here the District Court had that evidence. But then the second thing is when we get to strict scrutiny, the State has said, give us your justification. And that's really, I think, the problem with the first congressional district in this case, is that the State was operating on an error of law, first of all, and second, that it just did not provide the justification. And that's what the Voting Rights Act, Section 2 and Section 5 focus on, is not just, as you said, in Alabama, the Court not just picking a number out of thin air, but showing us there's a problem here potentially with respect to racial aggression. There's a problem here with respect to vote dilution. And with respect to the first congressional district in this case, there just wasn't evidence of a potential problem at vote dilution, because at the lower percentage, not being a majority minority district, the African-American community was able to elect its candidate of choice, really on a sustained basis over a period of many years and by wide margins. So, and this is on page 49A of the District Court's opinion. It said, look, the State just didn't make the case. It also said the State was operating on a mistake of law. And so just getting back to your question, you know, we understand that this is a somewhat delicate balance, and we think that the Court has attempted to balance the important interests protected by the Equal Protection Clause against the concern that States have and the flexibility that States need by adopting these two different parts of the standard racial predominance and then the strong basis and evidence for strict scrutiny. Roberts. Thank you, counsel. Mr. Clement, you have four minutes remaining. Clement. Thank you, Mr. Chief Justice. A few points in rebuttal. First of all, it is worth recognizing that six trial court judges looked at Congressional District 12, and four out of the six said that politics, not race, prevailed. So it's a funny sort of law that's going to defer to the minority of two. I don't think you can just ignore the State court decision on the grounds that, well, they weren't specific enough or something. I would point you to Appendix B-161 through 163, which are the relevant fact findings of the State trial court where they were unanimous in finding, among other things, quote, Dr. Hofeller constructed the 2011 12th Congressional District based on a whole voter tabulation districts in which President Obama received the highest voter totals during the 2008 election. The only information on the computer screen used by Dr. Hofeller in selecting the VTDs for inclusion in the 12th District was the percentage by which President Obama won or lost a particular VTD. And, of course, that gets to the need for an alternative map and the difficulty here, because it's all well and good to say, well, we looked at it afterwards and they pulled in all these African-Americans. But guess what? They pulled in all these Democrats, too, because the African-Americans are Democrats. And what they could have done, which would have been simple enough if it were true, is to draw a map that shows, actually, Hofeller's a liar. He wasn't using the 2008 presidential election results, because if he had used those, he would have come up with a different map. That would have been easy to do. They didn't do that. Any alternative map would have been easy to do here, and they didn't do it. Now, they say they didn't do it in other cases as well, and I think there are two reasons that explain that, neither of which reflect particularly well on the idea we should get rid of the map requirement. One reason they didn't do it is because in all of these cases, they thought that as long as they could get the State to say we had a BVAP floor of 50.1 or 55 percent, we're off to strict scrutiny land, so we don't need a map on predominance. That's actually wrong, and I think this Court will say that's wrong. The second reason is most of these challenges are brought by people who are at least as concerned about Democratic political prospects as they are about avoiding race. And the problem with putting an alternative map together is should you actually prevail, those no-good, dirty Republicans on the other side could use the map and then say, well, look, you can't really complain about that being a partisan gerrymander because it was your map. So if you really want people to bring race claims and not dressed-up partisan claims, make them put them to their proof. Make them put together an alternative map that works. Now, as to Guilford County, there's several responses here. First of all, it's all well and good to say they pulled in 75,000 African-Americans or hauled in all these African-Americans. They were all Democrats as well. And that's why even there, if you had an alternative map that showed, no, there's a different way to do Guilford County, and that would bring in Democrats and not bring in African-Americans, then you'd have something. But just the fact that they brought in a bunch of African-Americans because they were trying to bring in Democrats is about as interesting as the sun coming up in North Carolina, because everybody agrees there's about a 90 percent correlation between race and partisan identity. The second thing is, there's a very good reason, Justice Kagan, that we didn't make a Section 5 defense, because this wasn't a case about Guilford County. Their theory is not that we did something nefarious in Guilford County to overly comply with Section 5. Their theory is that CD12 was drawn as a majority-minority district. And the problem is nothing about Guilford County. Kagan. They did present both theories. They said, proposed findings in McCrory that it was purposed to purposely included a substantial number of African-American residents of Guilford County in CD12. The intentional placement of a significant number of black voters within CD12 establishes racial predominance. If I may respond, to get them to 50 percent, and here's the thing, if they focused on Guilford County, they would have had two problems. One, we would have had a Section 5 defense, if that's the way they actually teed it up. But the other ---- But it said because Senator Rucho apparently believed doing so was necessary to avoid retrogression for Section 5 purposes. Exactly, Your Honor. Exactly, Your Honor. If you look at everything ---- You didn't respond to it. Everything that they said about CD12 was a concern about retrogression, which is why, when Senator Rucho talked about CD12 and Guilford County, he didn't say, and so we drew it as a majority-minority district, he said, and we avoided any problem by making sure that we had at least a higher BVAP percentage than in the benchmark map. And that avoids any potential Section 5 concern with splitting that county and putting the African-Americans in Guilford County in the neighboring CD6, which was a Republican-leaning district, and they'd be the first to complain about that. Thank you. Thank you, counsel. The case is submitted.